## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**ALLIED WORLD NATIONAL**                          **CIVIL ACTION**
**ASSURANCE COMPANY**

**VERSUS**

**NISUS CORPORATION, ET AL.**               **NO. 21-00431-BAJ-EWD**

## RULING AND ORDER

This is a products liability case. Louisiana State University (LSU) entered into an agreement with a private company, Provident Group - Flagship Properties, to build new housing units on LSU's Baton Rouge campus. The constructed buildings were leased back to LSU to rent to students. After the project was completed, it turned out that a chemical product sprayed on wood in the buildings to prevent moisture buildup caused damage to the chlorinated polyvinyl chloride (CPVC) piping used for the fire safety sprinkler systems. Provident expended millions of dollars replacing the sprinkler systems, for which it was reimbursed by its insurance company, Plaintiff Allied World National Assurance Company. Allied then sued the manufacturer of the CPVC pipe, Defendant Spears Manufacturing Company, and the manufacturer of the chemical product, Defendant Nisus Corporation, asserting Louisiana Products Liability Act (LPLA), La.R.S. 9:2800.51 *et seq.*, redhibition, and warranty claims to recover amounts paid to its insured, Provident. (Docs. 1, 113). Allied's claims against Spears were dismissed after those parties reached a settlement. (Doc. 339). Now before the Court is Nisus and Counterclaim Defendant

Evanston Insurance Company's[1] **Motion for Summary Judgment (Doc. 290)**, which argues that Allied's claims are prescribed. The Motion is opposed. (Doc. 307). For the reasons that follow, the Motion will be granted.

## I.    BACKGROUND

### a. Facts

The following facts relevant to the Court's analysis are drawn from Nisus's statement of material facts (Doc. 290-2), Allied's response to Nisus's statement of material facts (Doc. 307-2), Nisus's reply to Allied's response (Doc. 318-1), and the record evidence submitted in support of these pleadings.

In 2016, LSU set in motion a plan to build multiple new buildings on its Baton Rouge campus. Land owned by LSU was leased to Provident, which would construct and own the buildings on the land and lease them back to LSU. (*See* Docs. 294-2; 294-3). Provident contracted with RISE Tigers, LLC, for project development. (*See* Doc. 294-4). RISE Tigers contracted with the Lemoine Company, LLC, to serve as the general contractor. (*See* Doc. 294-7). Lemoine then contracted with two subcontractors for the construction of the buildings. (*See* Docs. 294-10; 294-11). These subcontractors contracted with River City Fire Protection, Inc. for the installation of fire protection sprinkler systems using Defendant Spears's CPVC pipe. (See Docs. 294-13; 294-14; 294-15).

Provident also contracted with RISE Residential, LLC, to serve as the

---

[1] Evanston, as Nisus's insurer, was named as a direct-action Counterclaim defendant by Niles Bolton Associates, Inc, an architecture firm involved in the construction project. (Doc. 149). Niles Bolton's counterclaims against Nisus and Evanston were dismissed pursuant to a joint stipulation of dismissal on May 2, 2024. (Doc. 388).

Facilities Manager once construction was completed, as set forth in a Facilities Operation and Maintenance Agreement (FOMA). (Doc. 290-2 ¶ 3). Under the FOMA, Rise Residential was "to supervise, direct, and control certain custodial, maintenance, operations, replacement and repair obligations with respect to the Property . . . as the agent of Provident." (Doc. 294-8 ¶ 1.1). To the extent requested by Provident, RISE Residential was to "cause, supervise and/or coordinate the construction and installation of any renovations, improvements, substantive repairs, or replacements of a capital nature," defined in the FOMA as "Capital Improvements." (*Id.* at ¶ 3.4). The scope of RISE Residential's work was limited somewhat, as Capital Improvements excluded "(i) the construction of a new Facility and/or (ii) the re-construction of a Facility due to a casualty or other similar event." (*Id.*). RISE Residential would also have the right "to outsource and/or subcontract any aspect" of its duties to "third-party service providers," who would be "Agents" of RISE Residential. (*Id.* at ¶ 2.3).

Construction of the buildings began in October 2016. (*See* Doc. 290-2 ¶ 5). In 2017, Lemoine and its subcontractors developed a Moisture Control Plan to mitigate moisture issues that were arising in portions of the wood-framed buildings during construction. (*Id.* at ¶ 7; Doc. 307-2 ¶ 7). The Plan called for treating wood in all the buildings with a chemical spray called Bora-Care with Mold-Care, a product manufactured by Nisus. (Doc. 290-2 ¶ 7). Lemoine hired Arrow Pest Control of Baton Rouge, Inc., to apply the treatment in the partially completed buildings during the latter half of 2017. (*Id.* at ¶¶ 8–13).

3

The building project was completed in June 2018. (Doc. 294-28). Seven apartment buildings had been constructed, totaling more than one million square feet of real estate. (Doc. 307-2 at 19). In the buildings, more than 87,000 linear feet of sprinkler pipe and 10,500 sprinkler heads had been installed. (*Id.*). Completion of the project triggered a one-year warranty period for the CVPC sprinkler system under Lemoine's contract with RISE Tigers, the developer. (*See* Doc. 294-28; Doc. 290-1 at 6). It also triggered the beginning of RISE Residential's responsibilities under the FOMA as Provident's Agent and Facilities Manager. (Doc. 290-7 at 23). During the warranty period, five leaks in the sprinkler system in two different buildings were detected and referred to River City, the contractor that had installed the sprinkler systems, for repair. (Doc. 290-1 at 9).

When the warranty period ended on June 25, 2019, all repairs became the responsibility of Provident and RISE Residential. (*See* Doc. 294-52 at 8:7–9:17). Sprinkler leaks continued. Between August 9 and December 18, Marc Nichols, RISE Residential's building General Manager, recorded eleven leaks in five different buildings. (Doc. 294-34 at 8). RISE Residential referred these leaks to a company called FireQuest for repairs. (Doc. 307-2 ¶ 16). Although RISE Residential processed the invoices for these repairs internally, Provident would regularly receive a "check register," which reflected the amounts paid out by RISE Residential as facilities manager. (*Id.* ¶ 19; *see* Doc. 294-52 at 11:1–6).

By November 20, RISE Residential employees began to worry about the persistent leaks. Nichols "was concerned that there were more sprinkler leaks than

he was comfortable with," and so Alana Savoie, RISE Residential's Regional Director, "told him to start a list [of the leaks] so [RISE Residential] could track and see how many he's actually coming up with." (Doc. 294-32 at 25:18–23). RISE Residential also asked Vyron Bernard, a Construction Project Manager for RISE Tigers, to help investigate the cause and resolve the issue. (*Id.* at 27:3–7). Although RISE Tigers had completed its role as developer of the building project, RISE Residential saw the leaks as a potential "major issue," and so RISE Tigers was enlisted because it was involved in the original construction of the buildings. (*Id.* at 27:4–7).

Nichols forwarded a list of the documented leaks recorded up to November 20 with photos to Bernard and employees at Lemoine, the sub-contractor in charge of construction. (Doc. 294-40 at 3). Based on the information from the RISE Residential employees, Bernard thought "it looked like [the sprinkler leaks were] something more than just routine defects" and that "something else must [have been] going on." (Doc. 294-26 at 28:7–11).

The employees also began to speculate about the cause of the leaks. In an email to Bernard and Savoie on November 20, Nichols wrote that the latest leak was in "the same area as one that's been repaired prior," and noted that there was "an environmental stress fracture that [was] following the glue." (Doc. 294-39 at 4). On November 22, Savoie reported this finding to her supervisor, writing that it could be a "glue issue" and that RISE Residential "DO [sic] not want this to be a glue issue" because it could "turn into a nightmare." (Doc. 294-40 at 3). That same day, Nichols prepared Incident Report #280, which described the most recent sprinkler leaks and

reported an "environmental stress fracture" that "seemingly confirmed our beliefs there may be an issue with the glue used." (Doc. 291-41 at 2). Although Savoie testified that incident reports were generally sent to Provident, (Doc. 290-1 at 14), RISE Residential's Chief Operating Officer Courtney Gordon swore in a declaration that Incident Report #280 "was not provided to Provident . . . as part of any other report or communication," (Doc. 307-14 at 2).

To investigate the cause of the leaks, a section of pipe was given to Lemoine for testing. (Doc. 294-42 at 3). On December 11, Nichols followed up with Bernard regarding the communications between RISE Tigers and Lemoine, and Bernard responded saying that the section of pipe was "being tested by a lab to determine what contaminates may be damaging the pipe." (*Id.*). Bernard reported that he would set up a meeting with Lemoine once they got the lab results. (*Id.*).

That same day, Plastics Failure Labs, the laboratory retained to analyze the pipe sample, issued a preliminary report to Lemoine. (Doc. 294-43). In that report, Dr. Duane Priddy concluded that he thought the failure in the sample pipe was possibly due to "over-spray of products used to treat wood surfaces wherein the spray contained antimicrobial chemicals added to inhibit mold," adding that "[m]any antimicrobial chemicals are highly incompatible with CPVC pipe." (*Id.* at 2). In an email on December 16 to employees of Lemoine, Dr. Priddy wrote that he had "just received preliminary data from the lab confirming that it was the MoldCare [sic] ingredient in the Borecare + MoldCare [sic] solution that adsorbed into the cement and degraded the CPVC pipe causing it to fail." (Doc. 294-44 at 2). He also warned

Lemoine to "make sure that the BoreCare + MoldCare [sic] solution is sprayed onto wood surfaces BEFORE the CPVC piping is installed." (*Id.*).

More definitive results were sent to Lemoine on February 5, 2020. (Doc. 294-45). Dr. Priddy had concluded that the "cause of failure of the CPVC pipe was due to exposure of the CPVC piping to MoldCare [sic] overspray during treatment of the wood surfaces." (*Id.* at 5). In other words, by this point, Lemoine unquestionably knew why the leaks were occurring and that all sprinkler pipe exposed to Bora-Care with Mold-Care would need to be removed and replaced.

The employees at RISE Residential apparently never learned this information. Savoie and Nichols, who had begun the investigation in November 2019, had referred the issue to Lemoine, and were aware that lab results were incoming, never followed up or notified Provident of the issue and investigation. Notably, 34 additional sprinkler leaks were reported and repaired between December 11, when the last email in the record regarding the investigation was sent, and July 23, 2020, one year before Allied filed suit. (*See* Doc. 294-34 at 8). Despite this, the trail of communications ceases, to be picked up again when Provident received a notice from LSU on November 17, 2020, regarding the leaks and reporting the cause as "exposure to antimicrobial or anticorrosion chemicals used during the construction process." (Doc. 307-17 at 3).

Provident began removing and replacing the sprinkler systems in two of the buildings over the summer of 2021, (Doc. 294-46), and Allied instituted this lawsuit on July 23 of that year, (Doc. 1). Allied alleges that it paid Provident $9,047,532.89

7

for the removal and replacement of the sprinkler systems in four of the apartment buildings, and Provident recently made a $7,084,830.49 claim for the replacement of a fifth building's sprinkler system. (Doc. 307 at 6).

### b. Procedural History

Allied sued Nisus and Spears on July 23, 2021, alleging redhibition, warranty, and LPLA claims under this Court's diversity jurisdiction. (Doc. 1). With leave of the Court, Allied filed a First Supplemental and Amended Complaint against Nisus and Spears. (Doc. 113). Allied contends that by virtue of its payments to Provident, it is subrogated to the rights of Provident to recover amounts paid for damages caused by Nisus's products. (Doc. 113 ¶ 59). Allied's claims against Spears were dismissed after those parties reached a settlement. (Doc. 339). Now before the Court is Nisus's Motion for Summary Judgment (Doc. 290). The Motion is opposed. (Doc. 307). With leave of the Court, Allied filed a surreply to address a recently published case cited in Nisus's reply. (Doc. 385).[2]

## II. LEGAL STANDARD

A court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When

---

[2] That case, *Mosing v. Doug Ashy Bldg. Materials, Inc.*, 2023-3 (La. App. 3 Cir. 11/22/23), 375 So. 3d 613, features an LPLA prescription analysis in a lawsuit over defective stucco applied to the plaintiff's home.

8

ruling on motions for summary judgment, courts are required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Coleman v. Hous. Indep. School Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

## III. DISCUSSION

Nisus argues that Allied's claims are prescribed by Louisiana's one-year liberative prescriptive period for product liability cases. (Doc. 290-1 at 18 (citing La. Civ. Code art. 3492)).[3][4] Typically, "prescription commences to run from the day injury or damage is sustained." *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 995 F.3d 384, 388 (5th Cir. 2021). But "[u]nder the doctrine of *contra non valentem*, the prescriptive period begins to run 'on the date the injured party discovers or should have discovered the facts upon which his cause of action is based.'" *Chevron USA, Inc. v. Aker Mar., Inc.*, 604 F.3d 888, 893 (5th Cir. 2010) (quoting *Griffin v. Kinberger*, 507 So. 2d 821, 823 (La. 1987)). The doctrine tolls prescription under any of four "exceptional circumstances," one of which is "where the cause of action is not known or reasonably knowable by the plaintiff," termed the "discovery rule." *Taxotere*, 995 F.3d at 390–91

---

[3] When a federal court is sitting in diversity, as the Court is here, it is "obligated to apply the substantive law of the forum state." *Chevron Oronite Co., L.L.C. v. Jacobs Field Servs. N. Am., Inc.*, 951 F.3d 219, 225 (5th Cir. 2020) (quotations omitted).

[4] Allied's claims for redhibition and under the LPLA are subject to a one-year prescriptive period. *Peterson v. C.R. Bard, Inc.*, No. 13-CV-00528-JJB-RLB, 2015 WL 2239681, at *2 (M.D. La. May 12, 2015), *aff'd*, 654 F. App'x 667 (5th Cir. 2016); *PPG Indus., Inc. v. Indus. Laminates Corp.*, 664 F.2d 1332, 1335 (5th Cir. 1982). Allied's breach of warranty claim is as well. *PPG Indus.*, 664 F.2d at 1335 ("Louisiana courts have held unequivocally that actions based on a breach of warranty against defects are to be brought in redhibition instead of as a breach of contract.") (citing *Molbert Bros. Poultry & Egg Co. v. Montgomery*, 261 So.2d 311, 314 (La. App. 1972)).

(quoting *Morgan v. Entergy New Orleans, Inc.*, 2016-1250, p. 5, 13 (La. App. 4 Cir. 12/6/17), 234 So. 3d 113, 116, 120).[5]

Under the discovery rule, prescription runs from the time that the plaintiff has actual or constructive knowledge of the act, which has been defined as "the time at which the plaintiff has information sufficient to excite attention and prompt further inquiry." *Hebert v. Louisiana Farm Bureau Mut. Ins. Co.*, 2023-263 (La. App. 3 Cir. 11/29/23), 374 So. 3d 1170, 1175 (quotation omitted). "Constructive knowledge . . . requires more than a mere apprehension something might be wrong." *Aker Mar.*, 604 F.3d at 894 (quoting *Strata v. Patin*, 545 So. 2d 1180, 1189 (La. App. 4 Cir. 1989)). However, "when a plaintiff suspects something is wrong, he must 'seek out those whom he believes may be responsible for the specific injury.'" *Id.* (quoting *Jordan v. Emp. Transfer Corp.*, 509 So. 2d 420, 423 (La. 1987)). "The duty to act requires an investigation of the injury." *Taxotere*, 995 F.3d at 392 (citing *Jordan*, 509 So. 2d at 423–24 and *Rozas v. Dep't of Health & Hum. Res., State of La.*, 522 So. 2d 1195, 1197 (La. Ct. App. 1988)). The discovery rule "applies only when such ignorance is not willful and does not result from negligence." *Id.* at 391 (quoting *Cartwright v. Chrysler Corp.*, 255 La. 597, 232 So. 2d 285, 287 (1970)). In other words, "when a plaintiff acts reasonably to discover the cause of a problem, the prescriptive period

---

[5] In cases involving property damages, the Louisiana Supreme Court has explained that the discovery rule "is encompassed in the prescriptive period proscribed by La. C.C. art. 3493, as both essentially suspend prescription until the plaintiff knew, or reasonably should have known of the damage." *Marin v. Exxon Mobil Corp.*, 2009–2368 (La.10/19/10); 48 So.3d 234, 245 (2010). In other words, the discovery rule as understood in the doctrine of *contra non valentum* has been codified, and "the substantive analysis is the same under both La. C.C. art. 3493 and the discovery rule of *contra non valentum*." *Id.*

does not begin to run until he has a reasonable basis to pursue a claim against a specific defendant." *Aker Mar.*, 604 F.3d at 894 (quoting *Jordan*, 509 So. 2d at 424) (quotations and alterations omitted). In this inquiry, "reasonableness is assessed 'in light of [the plaintiff's] education [and] intelligence.'" *Taxotere*, 995 F.3d at 393 (quoting *Campo v. Correa*, 2001-2707, p. 12 (La. 6/21/02), 828 So. 2d 502, 511) (alterations in original). "Summary judgment is inappropriate where reasonable minds could differ as to the applicability of *contra non valentem*." *Id.* at 389 (citing *M.R. Pittman Grp., L.L.C. v. Plaquemines Par. Gov't*, 2015-860, p. 19 (La. App. 4 Cir. 12/2/15), 182 So. 3d 312, 324).

Allied filed its complaint on July 23, 2021, and therefore its claims are timely if the prescription period began on or was tolled until July 23, 2020. *See* La. Civ. Code art. 3492; La. Civ. Code Ann. Art. 3494. As the first sprinkler damage was incurred during a one-year warranty period following completion of the buildings in 2018 and Allied did not file suit until 2021, Allied's claims are facially prescribed. For this reason, the issue in dispute here is whether *contra non valentem* tolled the prescription period until Allied's suit was filed. Put simply, the question is whether Provident, as Allied's subrogor, had actual or constructive knowledge of the damage allegedly caused by Nisus's product before July 23, 2020.

Nisus argues that (1) Provident itself had actual or constructive knowledge of the damage prior to July 23, 2020; and (2) RISE Residential had actual or constructive knowledge of the damage prior to July 23, 2020, and its knowledge is imputed to Provident as Provident's agent. Allied responds that neither Provident

nor RISE Residential had actual or constructive knowledge of the damage before July 23, 2020, that the agency relationship between Provident and RISE Residential was limited to exclude any investigation into the cause of the sprinkler leaks, and that Nisus's own conduct must be taken into account when assessing constructive knowledge.

### A. Provident Did Not Have Actual or Constructive Knowledge of the Damage

Nisus argues that "Provident was aware of the sprinkler pipe leaking issues due to its receipt of monthly operating reports from Rise Residential, notice that it was paying for sprinkler pipe repairs since September 2019, and receipt copies of "Incident Reports" in November 2019 describing concern about the sprinkler system leaks." (Doc. 290-1 at 23).

There is a dispute as to whether Providence received Incident Report #280, which was created by Nichols to describe the sprinkler damage, (*See* Doc. 307-2 ¶ 23), and Nisus cites no evidence that Provident received monthly operating reports detailing the damage. Therefore, the undisputed facts merely support that Provident knew that money was being expended for sprinkler repairs by RISE Residential, (*see* Doc. 294-52 at 11:1–6). This does not constitute actual or constructive knowledge as a matter of law because the line-item expenses for sprinkler repairs, which revealed nothing about the cause, specific location, or nature of the damage, was too far removed from the facts that could have led Provident to Nisus's alleged culpability. *See Wells v. Zadeck*, 2011-1232 (La. 3/30/12), 89 So.3d 1145, 1149 ("Generally, prescription statutes are strictly construed against prescription and in favor of the

claim sought to be extinguished by it . . . ."). Provident received the sprinkler-repair expenses as part of its ownership of seven large apartment buildings for which the annual operating budget was over $2,000,000. (Doc. 307-2 at 20). Testimony also suggests that sprinkler leaks are relatively common in new construction projects, particularly in ones such as these with extensive sprinkler pipe systems. (*See* Docs. 307-5 at 31:5–12; 307-64 at 2:2–5; 307-6 at 9:22–10:5). The Court is loathe to find actual or constructive knowledge under such needle-in-the-haystack circumstances, where the relevant information hides in plain hindsight. *See Wells*, 89 So.3d at 1149.

## B. RISE Residential Had Constructive Knowledge of the Damage

Nisus next argues that RISE Residential had actual or constructive knowledge of the cause of damage to the sprinkler system. The Court agrees.

In November 2019, RISE Residential employees began to worry regarding the leaks. Nichols "was concerned that there were more sprinkler leaks than he was comfortable with," and he created a running list of leaks. (Doc. 294-32 at 25:18–23). The employees informed RISE Tigers, the developer, and Lemoine, the construction company, about the potential "major issue." (Doc. 294-32 at 27:4–7).

The RISE Residential employees also began to investigate the problem. In an email to Bernard and Savoie on November 20, Nichols wrote that the latest leak was in "the same area as one that's been repaired prior," and noted that there was "an environmental stress fracture that [was] following the glue." (Doc. 294-39 at 4). A section of pipe was given to Lemoine for testing. (Doc. 294-42 at 3). In a December 11 email to Nichols, Bernard wrote that the section of pipe was "being tested by a lab to

13

determine what contaminates may be damaging the pipe," and told Nichols that a meeting would be set up with Lemoine "as soon as they [got] the lab results." (*Id.* at 2, 3). In an email to Lemoine *only five days later*, Dr. Priddy related preliminary results confirming the fault of Bora-Care with Mold-Care and warned Lemoine to spray the product before the installation of CPVC pipe. (Docs. 294-44 at 2). On February 5, 2020, Dr. Priddy confirmed this assessment. (Doc. 294-45 at 5).

Apparently, the employees at RISE Residential never followed up with RISE Tigers or Lemoine for the expected lab results or notified Provident of the damage. Regarding the evidence before the Court, RISE Residential's role in the investigation screeched to a halt, even though 34 additional sprinkler leaks were reported and repaired between December 11, 2019, when the last email in the record regarding the investigation was sent, and July 23, 2020, one year before Allied filed suit. Under the discovery rule, "when a plaintiff suspects something is wrong, he must 'seek out those whom he believes may be responsible for the specific injury.'" *Id.* (quoting *Jordan v. Emp. Transfer Corp.*, 509 So. 2d 420, 423 (La. 1987)). "The duty to act requires an investigation of the injury." *Taxotere*, 995 F.3d at 392 (citing *Jordan*, 509 So. 2d at 423–24 and *Rozas v. Dep't of Health & Hum. Res., State of La.*, 522 So. 2d 1195, 1197 (La. Ct. App. 1988)).

Absent any explanation for the failure to continue investigating and the failure to notify Provident of the problem, the Court finds that RISE Residential did not act reasonably once it became aware of the persistent leaks, and was therefore on constructive notice before July 23, 2020, that Nisus's product was the probable

culprit. *See Aker Mar.*, 604 F.3d at 894 (explaining that "[w]hen a plaintiff acts reasonably to discover the cause of a problem, the prescriptive period [does] not begin to run until [he has] a reasonable basis to pursue a claim against a specific defendant" (quotations omitted)); *Taxotere*, 995 F.3d at 392 (explaining that the discovery rule "applies only when [a plaintiff's] ignorance is not willful and does not result from negligence").

"The heart of the inquiry into constructive knowledge is the reasonableness of" a party's "inaction." *Hebert v. Louisiana Farm Bureau Mut. Ins. Co.*, 2023-263 (La. App. 3 Cir. 11/29/23), 374 So. 3d 1170, 1175. In a similar case, a construction company whose cranes were malfunctioning received a report recommending "that it further investigate the noise from the rotating gears or bearing." *Expert Riser Sols., LLC v. Techcrane Int'l, LLC*, 2018-0612 (La. App. 1 Cir. 12/28/18), 270 So. 3d 655, 662 (affirming grant of summary judgment on prescription). In the face of the company's argument that it was unaware of the cause of the crane problems, the Court found instead that had the company "timely heeded . . . [the] advice to investigate further, it would have been led to the true condition of things." *Id.* (quotation and alterations omitted).

The facts here are different by only one degree, in that RISE Residential and Provident never received the report confirming that Nisus's product was causing the sprinkler leaks. But RISE Residential's failure to follow up or notify Provident of the persistent damage and investigation constitutes a lack of reasonable diligence that dooms Allied's argument, just as the failure to heed an investigation doomed the

construction company in *Techcrane. Id.* ("A plaintiff is deemed to know what he can learn through the exercise of reasonable diligence and cannot rely on ignorance attributable to his own willfulness or neglect.") (citing *Moore v. Chevron USA*, 16-0805 (La.App. 1 Cir. 5/25/17), 222 So.3d 51, 54)); *see, e.g., Mosing v. Doug Ashy Bldg. Materials, Inc.*, 2023-3 (La. App. 3 Cir. 11/22/23), 375 So. 3d 613, 618 (finding plaintiffs had constructive knowledge of defect when they "first noticed" damage to stuccoing on exterior walls, because although this did not give them actual knowledge "of the facts that would entitle them to bring" suit, it "excited their attention, put them on guard and had them call for an inquiry" by calling their contractor). RISE Residential was on notice of everything but the lab results, and was on notice for eight months before July 23, 2021, as dozens of sprinklers leaked and were repaired. During that time, RISE Residential failed to notify Provident or follow up on the cause of the damage. No reasonable jury could find that such failure, particularly when RISE Residential walked its investigation to the very edge of discovery, was the result of the diligent examination required of parties denying constructive knowledge. *See Bruno v. Biomet, Inc.*, 74 F.4th 620, 624 (5th Cir. 2023) (finding summary judgment inappropriate "where reasonable minds could differ as to the applicability of *contra non valentem*").

## C. RISE Residential's Constructive Knowledge Was Imputed to Provident

Next, Nisus argues that RISE Residential's constructive knowledge of the cause of the sprinkler leaks was imputed to Provident, its principle, under the law of agency. (Doc. 290-1 at 22 n.130). Allied responds that RISE Residential's agency was

limited because the agreement between the two entities required written approvals for certain work; excluded "the construction and installation of any renovations, improvements, substantive repairs, or replacements of a capital nature" from RISE Residential's duties/authority unless Provident specifically requested such action; and excluded "re-construction of a Facility due to a casualty or other similar event" from the scope of RISE Residential's agency without exception. (Doc. 307 at 19). Allied contends that the investigation into the cause of the leaks was outside the scope of RISE Residential's limited agency relationship with Provident, and, therefore, RISE Residential's constructive knowledge cannot be imputed to Provident. (*Id.* at 19–21).

It is a basic tenet of agency law that knowledge of the agent is imputed to the principal when it is received by the agent while acting within the course and scope of the agent's duties. *Metropolitan Wholesale Supply, Inc. v. M/V Royal Rainbow*, 12 F.3d 58, 62 (5th Cir. 1994). It is also a "well settled principle that knowledge possessed by the agent is imputed to the principal even if the agent neglected to specifically convey those facts to the principal." *Bell v. Demax Management Inc.*, 824 So.2d 490, 493 (La. App. 4 Cir. 2002) (quoting *Bank of Louisiana v. Argonaut Ins. Co.*, 248 So.2d 349, 352 (La. App. 4 Cir. 1971)). There is no dispute that an agency relationship existed here. (*E.g.*, Docs. 307 at 3; 290-1 at 5). Allied merely attempts to argue that the scope of the relationship did not include RISE Residential's constructive knowledge of the source of the sprinkler damage. An analysis of the agreement between the parties shows that Allied's argument fails.

Under the provisions of the FOMA, RISE Residential agreed to "undertake to

supervise, direct, and control certain custodial, maintenance, operations, replacement and repair obligations" at the buildings. (Doc. 291-9 at 8). Section 3.2, entitled "Maintenance of Property and Equipment," provided:

> The Facilities Manage shall keep and maintain the Property in good operating condition, order, and repair, and in connection therewith, shall formulate and implement a written preventative maintenance program designed to efficiently and effectively maintain the condition of the Property.

(*Id.* at 15). And Section 3.4 provided:

> To the extent requested by Provident-Flagship, subject to the prior written approval thereof of LSU, Facilities Manager shall cause, supervise and/or coordinate the construction and installation of any renovations, improvements, substantive repairs, or replacements of a capital nature . . . .

(*Id.* at 16). In all, RISE Residential agreed to perform its duties "in good faith and exercising prudent commercial judgment," and "in a manner reasonably calculated to . . . protect and preserve" the buildings it managed. (*Id.* at 11–12).

Each of these sections strongly supports the conclusion that RISE Residential's duties included its knowledge of the investigation into the damage. Again, there is no dispute that RISE Residential was aware of the persistent damage, began the investigation in response, and was aware that the investigation continued. Nor is there a dispute that it was RISE Residential's job to repair the sprinkler leaks. Indeed, Exhibit 3.1 to the FOMA expressly confirmed that RISE Residential's responsibilities include responding to "[c]ontinuous leaks that may result in damage to facility or contents." (Doc. 291-9 at 87). Nowhere does the FOMA's language suggests that the scope of RISE Residential's agency was limited to exclude its

18

awareness of the problem it was tasked by the FOMA to repair and its knowledge of the almost immediately successful investigation into the cause of the damage.

Additionally, under the "Preventive Maintenance Work Orders" section, RISE Residential agreed that "Sprinklers . . . [would] be tested by an independent vendor who will perform a comprehensive inspection of the system and recommendation of repairs/replacements." (Doc. 291-9 at 88–89). It defies belief that RISE Residential could be required to coordinate a "comprehensive inspection" of the sprinkler system, but, when it came to Lemoine's investigation into the sprinkler leaks, prompted by RISE Residential's own concern, RISE Residential was suddenly absolved of any responsibility or duty to learn of the results and communicate such results to Provident.

Allied seems to suggest that the constructive knowledge acquired regarding the cause of the sprinkler leaks cannot be imputed to Provident because RISE Residential's had no authority to repair the entire system if the entire system was damaged. (Doc. 307 at 19 (referring to the FOMA's exclusion of "re-construction of a Facility due to a casualty or other similar event" from the scope of RISE Residential's agency)). But whether RISE Residential had the authority to fix the entire system is separate from the inquiry into its duty to inquire and notify its principal of what it knew. Nichols began creating a list, prepared a report theorizing that the cause of the damage was a glue issue in the CPVC piping, and communicated with Bernard at RISE Tigers regarding the testing of the sample pipe. Savoie emailed her supervisor anxiously, saying RISE Residential "DO [sic] not want this to be a glue issue," because

19

that could be a "nightmare." (Doc. 294-40 at 3). Absurdly, Allied argues that this documented awareness and concern was outside the scope of RISE Residential's duties. But the FOMA required RISE Residential to use "good faith and exercise[e] prudent commercial judgment" and act "in a manner reasonably calculated to . . . protect and preserve" the buildings under its care. (Doc. 294-8 at 11–12). The conclusion demanded by this language and the excerpts above affirms that the scope of RISE Residential's agency included its constructive knowledge of the cause of the sprinkler damage.

Allied points to the depositions of Nichols and Savoie as evidence that the investigation was not within the scope of their duties. (Doc. 307 at 19–20). Savoie testified that she "[didn't] even think this FOMA applie[d] to [the investigation] at all" because it was "part of a construction investigation of what's going on with the system as a whole." (Doc. 307-4 at 8:24–9:4). Nichols testified that his duty did not include addressing the growing concern regarding the sprinkler damage and identifying the root cause. (Doc. 307-13 at 10). Regardless of the legal significance of the employees' interpretation of the scope of RISE Residential's agency, the Court finds that the FOMA encompassed their understanding of the problem and their role in the investigation. Their constructive knowledge of the problem and the fact of the investigation was therefore imputed to Provident.

Essentially, Allied asks the Court to interpose an artificial wall separating RISE Residential's maintenance duties, sprinkler repair duties, and general duties to preserve the buildings from the constructive knowledge it acquired regarding the

cause of the sprinkler leaks. The Court will not do so. No reasonable jury could find that RISE Residential's constructive knowledge of the sprinkler damage was outside the scope of its agency relationship with Provident. *Anderson*, 477 U.S. at 248. Because knowledge of an agent is imputed to its principal, Provident had constructive knowledge of the sprinkler damage before July 23, 2020.[6] Allied's subrogated claims are prescribed.

### D. Nisus's Conduct Creates No Genuine Issues of Material Fact

In an attempt to avoid prescription, Allied asserts that because Nisus knew of the incompatibility of Bora-Care with Mold-Care with CPVC piping and failed to warn Provident, Nisus prevented Provident from acquiring constructive knowledge of the problem. (Doc. 307 at 24–25 (citing *LaShip, LLC v. Hayward Baker Inc.*, No. CIV.A. 11-546, 2013 WL 5739062, at *7 (E.D. La. Oct. 22, 2013) ("The ultimate issue in determining whether a plaintiff had constructive knowledge sufficient to commence a prescriptive period is the reasonableness of the plaintiff's action or inaction in light of his education, intelligence, *and the nature of the defendant's conduct*." (quotations omitted and emphasis added))). But there is no evidence that Nisus provided incorrect information about Bora-Care with Mold-Care to Provident, RISE Residential, or any party involved into the leak investigation. Rather, RISE Residential acquired constructive notice of the cause of the damage independent of any action or omission of Nisus. In other words, the evidence reveals that Nisus did

---

[6] Because the Court finds that RISE Residential's constructive knowledge is imputed to Provident, it does not address Nisus's additional argument that RISE Tigers and Lemoine were themselves acting as agents of RISE Residential in their investigation of the pipe damage. (*See* Doc. 290-1 at 22 n.130).

not prevent RISE Residential from acquiring the "information sufficient to incite curiosity, excite attention, or put [it] on guard to call for inquiry." *Dominion Expl. & Prod., Inc. v. Waters*, 2007-0386 (La. App. 4 Cir. 11/14/07), 972 So. 2d 350, 357. Again, RISE Residential's constructive knowledge is imputed to its principal, Provident, and therefore Allied's claims are prescribed.

IV.    **CONCLUSION**

Accordingly,

**IT IS ORDERED** that Defendants Nisus Corporation and Evanston Insurance Company's **Motion for Summary Judgment (Doc. 290)** be and is hereby **GRANTED**, and the claims against Nisus be and are hereby **DISMISSED WITH PREJUDICE**.

Judgment shall issue separately.

Baton Rouge, Louisiana, this 4th day of June, 2024

_____
**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**